JOHNSON *v.* HILTON & DODGE LUMBER COMPANY.

1. The act "to establish the city court of Brunswick, in and for the county of Glynn," approved December 9, 1895, created a court of like character and jurisdiction as the city courts of Atlanta and Savannah; and inasmuch as the 44th section of that act provided that "said court shall be held at the court-house of Glynn county," the effect of the act was to establish, in the city of Brunswick, a city court with jurisdiction over the

whole county of Glynn. It follows that a writ of error lies from this court to the Supreme Court of this State.

2. It was erroneous to nonsuit the plaintiff in an action for a homicide alleged to have been caused by the defendant's negligence in furnishing the deceased, one of its employees, with unsafe and dangerous appliances with which to do his work, and in knowingly employing and retaining in its service an unskillful colaborer by whose fault, in connection with such dangerous appliances, the homicide was alleged to have been committed, when the evidence for the plaintiff warranted a finding that there was such negligence on the part of the defendant, and the death of the deceased was not due to any negligence on his part.

Argued October 26, — Decided December 21, 1897.

Action for damages. Before Judge Atkinson. City court of Brunswick. May term, 1897.

Lucy Johnson sued for the homicide of her minor son, Peter Johnson, who, she alleged, was killed without fault on his part, and through the negligence of the defendant in the operation of its sawmill, while he was at work in its service as a laborer in the mill. The declaration alleged, in substance, that at the time of the injury which caused his death, he was at work in a run between two lines of dead rollers, upon which lumber, as it was sawn, was rolled off from the saw ; and that a piece of lumber which had just been sawn from a log then being sawn up, and which had fallen upon the rollers but had not been carried off, was caught at the end of the log-carriage as another piece was being sawn from the log upon the carriage, and was driven back with great force and violence against plaintiff's son, and penetrated his body, inflicting a wound from which he died. The negligence that caused his death consisted in the following: The company employed as a sawyer, to operate the saw, a person who was a common laborer and not a sawyer, and who was inexperienced, incompetent, and negligent in and about the work ; which facts the defendant knew, or could, by the exercise of slight diligence, have known, at the time he was employed, and this person (Reuben Oliver), while operating the saw, had his back turned toward, and his face away from, the way the carriage was moving, and the plaintiff's son, and therefore did not see that the carriage had caught the piece of lumber and was driving it towards plaintiff's son. A competent and careful sawyer would have

understood to keep a lookout in the direction in which the carriage was moving, and when the piece of lumber was caught by the carriage would have seen the danger, stopped the carriage before anybody was hurt, and had the lumber moved out of the way. The rollers were "dead" rollers, whereas they should have been "live" rollers, so that they would have carried off the piece of lumber as soon as it was cut from the log and fell upon the rollers. If they had been live rollers, plaintiff's son would not have been killed, for the live rollers would have promptly carried the piece of lumber out of the way of the carriage. The lever for working the saw, instead of being placed behind the saw, as it is in all properly and safely arranged sawmills, was in front of it, thus putting the carriage behind the sawyer so that he could not readily see whether or not the carriage had caught against anything or menaced any danger to other employees. The plaintiff's son had neither wife nor child, and she was dependent on him for a support.

The defendant, at the conclusion of the evidence submitted by the plaintiff, moved for a nonsuit, which the court granted on each and all of the grounds of the motion. These grounds were: The evidence does not authorize a recovery against the defendant, on the allegations in the declaration. It shows that plaintiff and the deceased and his father had full knowledge of the character of the place at which the deceased was working, and. the risk and danger incident thereto, and consented for him to work there. They knew that Reuben Oliver was the sawyer in charge of the saw for some time prior to and on the day of the accident, and they consented for the deceased to work there under those circumstances, and thereby assumed the risk incident to the employment. They knew that dead rollers, and not 'live rollers, were in use in the mill for years prior to and at the time of the homicide, and knew the condition of the rollers. The evidence shows that the homicide was caused by means different from those alleged in the declaration, and in a different manner, and that the homicide was caused by the negligence of the deceased. It does not clearly and to a reasonable preponderance show the plaintiff and the

deceased each to be without fault; nor that the want of suffi-
cient experience or skill upon the part of the defendant's saw-
yer caused or contributed to the injury; nor that the alleged
defect or defects in the rollers, or that the rollers being dead
rollers and not live rollers, caused or contributed to the injury.

The following appeared from the testimony of W. H. Mont-
gomery, inspector of lumber at defendant's sawmill, who was
in charge of the department where Peter Johnson was working
at the time the injury occurred: Peter was under the super-
vision and direction of witness, who placed him where he was
working at that time. Witness and Peter were in the run be-
tween two lines of dead rollers, standing shoulder to shoulder,
and facing in the same direction, Peter holding a piece of tim-
ber which witness was marking, when a piece of plank, slab or
board was knocked against him by the saw-carriage, striking
him in the side and inflicting the wound which caused his
·death. The two lines of dead rollers were parallel to each
other, and were at the right of and parallel to the course of the
saw-carriage as it passed down the saw-carriage track. Reuben
Oliver, the sawyer who controlled the movements of the saw-
carriage, was standing on the same side of the carriage-track,
and at the upper end of it, back of the saw. Peter Johnson was
standing at the left of the witness. The lumber was placed on the
saw-carriage, and was partly cut by the saw, when it reached the
upper end of the line of dead rollers next to the saw-carriage.
The saw was sawing another piece of lumber while it was push-
ing this piece along. The log was about 23 feet long. One end
of the saw-carriage was against the other end of the lumber that
struck Peter. The piece of lumber was on the dead rollers, and
was driven by the saw-carriage against Peter's side. Witness
did not see the lumber at the moment it was cut and fell from
the saw. He saw it after it fell from the saw, and when it was
carried by the saw-carriage against Peter's side. When it
struck Peter it jammed his body against witness, and knocked
both of them down and over several rollers and a jump-saw box.
Both were driven about 14 or 15 feet beyond the jump-saw box
before the carriage stopped. After witness had fallen in the
hole beyond the jump-saw box, Peter was forced and driven

about 10 or 20 feet beyond him, when he was jammed by the piece of lumber against the rollers. It was impossible for him to escape after the lumber had struck him; it struck him with such force that it knocked him powerless. He made every effort possible to get away from it. He was practically a dead man immediately after he was struck. He could not have avoided the injury unless he had not been there, or unless the saw-carriage had been run properly. When he was struck he was at the place where his duty required him to be at that time, and he could not have properly done the work it was his duty to do and avoided the happening of the injury. His attention was directed immediately on the work he was doing, holding the piece of lumber for witness, as his duty required at that time. Witness was to mark the lumber after it was sawn, as it came from the saw-carriage, while it was still lying on the rollers. Witness could not state positively in what direction Peter was looking at the time he was struck. The supposition is that he was looking two or three ways; he was looking at the piece of lumber he was holding, and was looking at the saw where the next piece was coming from, and also looking towards the outside to see where the piece of lumber was going to; but his immediate attention should have been directed right on the piece he was holding. It did not involve a full view of the saw and saw-carriage. He was standing square with the line of rollers, and at right angles with witness. His attention was riveted on the piece of lumber which witness was marking. He should have kept on the lookout, though; for one was required to keep on the lookout there the whole time. It is the duty of everybody to look out for himself in a death-trap like that. If Peter had been looking at the piece of lumber which struck him, he would have been neglecting the work he was put there to do and was doing, and it required his whole attention on that work. Sometimes a saw-carriage will go like a flash of thought; open the lever wide and you could not see the carriage; you would hear something buzz and then a crash. Given the conditions under which the carriage was traveling, witness would say it was traveling at that time 50 feet in five seconds. It is not true that pieces of lumber are frequently

caught in the manner in which the piece that struck Peter was caught, and hurled violently; but occasionally they are. It was the fault of Oliver, the sawyer, that Peter was injured. It is not true that in order to have observed Peter at the time the accident occurred, he would have had to neglect his duty. For a part of the time the duties of a sawyer require him to look at the saw. He should not feed the saw any faster than it will saw lumber straight. He must look where the lumber goes to, especially when dead rollers are used, and see that one piece is out of the way before another is put down to the saw. It is not necessary that the sawyer's attention should be riveted on his saw and the lumber, and taken away from the people in front of or behind his saw. A sawyer must take sufficient time in sawing to look after the safety of the men who are connected directly with him. After the saw-carriage had started he could have stopped it instantly. He did not stop it, but allowed it to go as far as it could then go. He was not a competent and skilful person, sufficiently skilled, careful, and competent to do the work of sawing in the sawmill. He had practically no knowledge or skill with reference to the work he was doing at that time. It is necessary for a person to have considerable skill, knowledge and experience to operate the saw and saw-carriage. If Oliver had been competent and skilful as a sawyer, and paid attention to what he was doing, the accident would never have happened. A competent sawyer would have been more watchful, and would have stopped the saw-carriage in all probability before the accident could have happened, and the injury would have been very much lighter. Witness knew when he placed Peter where he was that Oliver was running the saw, and that he would continue to operate it. James L. Foster was at that time the general manager and vice-president of the defendant company. He could not have failed to know that Oliver was not a sufficiently skilful, competent and experienced person to operate the saw and saw-carriage. Oliver had been working there for several years, and they knew he was not skilful in that branch of the business. The defendant and Foster had all knowledge possible as to his incompetency, for they knew he had never sawed before. Moreover, Foster would not

have attempted to pay a competent sawyer the wages he was paying to Oliver. They were paying him $1.25 per day, and the sawyer who had preceded him was paid $3.50. A sawyer on the other side of the mill, operating a saw and saw-carriage similar to those operated by Oliver, was getting $2.50 per day. If live rollers had been used by the defendant in its mill, instead of dead rollers, the injury probably would not have occurred. Peter would not have been anywhere near the place he was when he was hurt; he would not have been required to be there. The dead rollers in the mill were old and worn, and out of line. They were a menace to life and limb, and a constant source of danger. Since Peter was killed the dead rollers in the defendant's mill have been supplanted by live rollers. The place where Peter stood and was placed at work was a dangerous place, because of the use of the old and worn-out dead rollers, and because the sawyer was incompetent. From the experience of witness in sawmills, which extended over a number of years in various parts of the country, he would say that about 98 per cent. of the sawmills in this country use live rollers instead of dead rollers. Live rollers are much safer to persons working in the situation in which Peter Johnson was required to work. The necessity for the use of live rollers instead of dead rollers lies in the saving of labor and expense, and in lessening danger to life and limb of those working in the mill. By using them the danger is minimized. No matter how careful and competent he may be, the workman is exposed to more danger from dead rollers than from live rollers. The live rollers carry off the lumber as it comes from the saw, and the employee is out of the way of the line of travel of the lumber. With the dead rollers he is closer to the saw, has to shove the lumber over the dead rollers to get it away from the saw, and is at all times either on the side of, or right over, the lumber on the rollers as it comes from the saw.

Berrien, a laborer working in the mill at the time of the injury, testified that he heard somebody holler, "Look out, something is the matter there." He looked towards Peter Johnson and saw the end of the board when it struck him and carried him to the end of the track. He looked first towards Peter

and then towards the sawyer, Oliver, then turned his eyes on Peter, and Peter was backing with the board up against him. Witness saw it when it jammed him up against the saw-box. He saw him from the time he was driven back, except when he (witness) was looking at Oliver. He looked to see if Oliver was going to stop his carriage. Oliver did not stop it immediately, nor until it ran its full length down the track. Oliver was not looking down the track on which the carriage runs, but was looking "quartering" over towards the side witness was on, which was the opposite side of the carriage from that on which Peter was. Oliver may have been looking at the saw, but witness is pretty sure he was looking in the direction of witness. When the board first struck Peter he was some five or six feet away from Montgomery. There were two lines of rollers between Montgomery and the saw-carriage. Peter was in between the first line of rollers and the second line, and Montgomery was outside of the second line of rollers entirely. The run between the rollers is about two feet, or perhaps a little more. Montgomery was checking a piece of lumber at that time. Peter was not holding that piece of lumber for Montgomery when he got jammed, but he was trying to hold the piece that jammed him. He was trying to hold it up against the log. If Peter had been standing by the side of Montgomery, holding the lumber for him to check, he could not have been hurt, because the end of the lumber that struck him could not have reached him. The board did not knock Peter against Montgomery, but struck Peter and jammed him up, and spread and struck Montgomery, and knocked Montgomery down. When the end shoved Peter as far as it could, it bent, and the bend was what struck Montgomery. Peter was about three feet from Montgomery, where the board had him jammed, when it bent and knocked Montgomery down. Peter was one of the three men who had charge of the holding of the lumber up against the log, so that it would not hit anything and be clear over the back of the saw    It was his duty to help to take lumber off from the saw. It was his business when the tripper would throw the board off from the carriage to put it on the rollers and carry it forward. He was the second or third man

from the saw.   Witness thinks he was the second.   The first
man to the saw, as soon as the sawyer began to saw the board,
would grab the board with his hook, and hold it close to the
log; then the second man would grab hold of it and hold it
until it reached the third man; and by that time the board
would be just about cut off.   When Peter went to grab hold
of the board with his hook, he got struck in the side with the
end of the board, and it carried him back so fast that he could
not get loose.   He was the man where the board had just
reached.   It was Peter's business to grab hold of the board near
the end, and hold it close up against the log until the board
had been sawed off.   If the board had been held close up
against the log like it should have been, it would have hurt
nobody.   If there was lumber going in that way, it would be
dangerous for a man to stoop down there so that the piece of
lumber could hit him.   It would be his duty to stand up right
away from the carriage, so that the lumber could not strike
him, grab it firmly with his hook and hold it up against the
log, and walk alongside of the carriage until the lumber was
cut off.   Witness supposes that when Peter got hold of the
board, he pulled it a little too hard and too far away from the
log, and the end caught him and pressed him back so that he
could not get loose.   Witness would not swear that he pulled
the board out against himself.   Witness is pretty sure that
Peter was trying to catch hold of the board when it came on
the carriage and struck him.   Peter had hold of his hook in
one hand when the board hit him.   It would have been the
duty of Oliver to stop the saw just as soon as he saw the lum-
ber strike Peter.   Peter was carried five or six feet after he was
hit by the lumber.   It may not have been so far, and may have
been a little farther.   Witness almost knows that if Oliver had
been looking he could have stopped the carriage after Peter
was hit.   He is pretty sure Oliver could have stopped it before
the lumber jammed Peter up against the saw-box.   Another
witness testified that all the sawyer would have to do in order
to stop the carriage would be to grasp his lever and give it a
jerk, and the carriage would be stopped.   There was further
testimony with reference to the duties of the sawyer, etc.

Plaintiff testified, that the deceased was sixteen years of age, and without wife or children; that he contributed to her support, and she was dependent on him for support. He had been working at the mill three years. Her husband was physically incapacitated to support her, and he turned the boy over to her and told her she could have what he made. Her husband sometimes went to the mill and collected the boy's wages, but turned them over to her. She knew the mill was a dangerous place, and always told Peter to be careful. Subsequently the witness testified that she did not know whether the mill was dangerous or not; she was never in a sawmill.

*Johnson & Krauss*, for plaintiff.
*Courtland Symmes* and *Brantley & Bennet*, for defendant.

FISH, J. This case was tried in the city court of Brunswick, and brought by writ of error from that court to this. The defendant in error made a motion, in this court, to dismiss the writ of error, upon the ground that "this court has no jurisdiction to determine writs of error from the city court of Brunswick, . . said city court of Brunswick not having been established within the limits of an incorporated city, or for an incorporated city." In support of this motion the movant relies upon section 5836 of the Civil Code, which section is a part of the constitution of the State, also upon the decision of this court in the case of *Stewart* v. *The State*, 98 *Ga.* 202, and upon the act creating the city court of Brunswick (Acts of 1895, p. 374). The constitutional provision invoked is as follows: "The Supreme Court shall have no original jurisdiction, but shall be a court alone for the trial and correction of errors from the superior courts, and from the city courts of Atlanta and Savannah, and such other like courts as may be hereafter established in other cities." It is not contended that the court in question is not a court of like character and jurisdiction as the city courts of Atlanta and Savannah. The contention is that "the title to the act establishing the city court of Brunswick shows it 'to have been established in and for the County of Glynn,' and no part of the title to said act, or the act itself, shows said court to have been established in or for an incorporated city, unless

it be held that the name 'Brunswick' shows that fact"; and that, "section 44 of that act provides 'that said court shall be held at the court-house of Glynn county.'"    The decision in the case of *Stewart* v. *The State*, supra, does not support the contention of the defendant in error.    In that case, the Supreme Court decided that "Courts established upon the recommendation of grand juries under the provisions of the act of October 19th, 1891, as amended by the act of December 23d, 1892, are not '*city courts*' within the description of such courts as expressed in the language, 'and such other like courts as may be hereafter established in other cities,' employed in the section of the constitution above cited"; the section cited being the one invoked in this case.    In the opinion in that case, Justice Atkinson, discussing the kind of courts which fall within the descriptive words, "such other like courts as may be hereafter established in other cities," in the connection in which they are used in the constitution, says: "Two things are essential to the establishment of a court which will meet the requirements of the constitution in this respect.    It must be a court modeled substantially upon the plan of the city courts of Atlanta and Savannah as they existed in those cities at the time of the adoption of the constitution.    Identity in the minor details of practice, procedure or jurisdiction is not required, if in those respects they be substantially similar to the courts above referred to; but to the creation of such a court it is absolutely indispensable that it be given a situs within the limits of an incorporated city.    If it be located by the legislative act creating the court within an incorporated city, the legislature may confer upon it such jurisdiction beyond the limits of the city within the county as it may deem proper, but by the express language of the constitution it must be located within the corporate limits of a city. The mere fact that there may be an incorporated city within the limits of the county for which one of the courts of the character now under review is created, does not make it a city court within the meaning of this constitutional provision.    There may be a half-dozen incorporated cities in one county.    The legislature would have the power to create within the limits of each of such incorporated cities, if it saw proper to do so, a city

court which would meet all the requirements of the provisions of the constitution now under consideration; but in order to the creation of such courts, the act creating them must locate them within the corporate limits of a city." Clearly this decision does not support the contention of the defendant in error, but, on the contrary, shows it to be unsound. While it appears from the title of the act that the court now in question is established "in and for the county of Glynn," it also appears that it is the "city court *of Brunswick*" which is established "in and for the county of Glynn"; and section 44 of the act provides that, "said court shall be held at the court-house of Glynn county." This court can and does take judicial cognizance of the facts that Brunswick is an incorporated city of this State, that it is situated in Glynn county, that it is the county-site of that county, and that the court-house must necessarily be located at the county-site, and therefore *in the city of Brunswick*. The court was established "*in*" the county of Glynn, because it is located in the city of Brunswick, which is included within the limits of that county; it was established "*for*" the county of Glynn, because its jurisdiction is not confined to the incorporate limits of the city, but extends over the whole county. The city court of Brunswick was created by legislative enactment; the act which established it located it in an incorporated city; and the court being thus located, the legislature could "confer upon it such jurisdiction beyond the limits of the city, within the county, as it [might] see proper." The legislature saw proper to give it jurisdiction over the whole of Glynn county, which it had the constitutional right to do, for the court is like the city court of Atlanta, which was in existence and had jurisdiction over the entire county of Fulton when the constitution of 1877 was adopted. See *Whittendale* v. *Dixon*, 70 *Ga.* 721.

2. The plaintiff sought to recover damages from the defendant for the homicide of her minor son, alleged to have been caused by the negligence of the defendant in furnishing the deceased, one of its employees, with unsafe and dangerous appliances with which to do his work, and in knowingly employing and retaining in its service an unskilful colaborer, by

whose fault, in connection with such dangerous appliances, the homicide was alleged to have been committed. The evidence of the plaintiff warranted a finding that there was such negligence on the part of the defendant, that the death of the deceased was not due to negligence on his part, that he contributed to the support of the plaintiff, and that she was, at least in part, substantially dependent upon him. It was, therefore, erroneous to grant a nonsuit.

*Judgment reversed. All the Justices concurring.*